Your Honor, my name is Michael Hertz and I'm appearing for the Garber's boat cases. Thank you, Counsel. Try to talk a little louder. I'm sorry. Is that better? Yes, thanks. Thank you. This is an appeal which began as a motion in the Garber Chapter 7 case by National Union for payment of virtually all of its attorney's fees as an administrative expense. National Union had never been appointed as a representative of the bankruptcy estate. Wait a minute. Which appeal are you talking about, the attorney's fees appeal? Well, there are two attorney's fields, Your Honor. This is the administrative expense case. This is the Garber case. It's the Garber case. Garber appeal. Yeah. So we're talking about what was awarded by the bankruptcy court. So you're talking about the no-throw-tunk order. Yes, I am. Okay. Okay. I pointed out that there was never an appointment under either Section 327 or 503b3b. Before you get to that, Counsel, and I hate to interrupt you quite so quickly, but I'm a little worried about whether you even got your notice filed on time. Well, Your Honor, I can only tell you what is in my brief, okay? Is that the best? I mean, the 30-day timeline was not met, correct? I don't agree with that, Your Honor. The question is whether Well, it wasn't the 30 days from the day of the order. All you're arguing is the motion to reconsider extended the time. I am, Your Honor. There was one order, a single order, and there was a request that it be dealt with. And that is exactly what Judge Coyle said. You have to read his opinion. It's very clear what he's saying. I read his opinion, and I got to the end, and there was an order, and then the 30 days went by, and the only thing that I understand is they wanted to reconsider regarding a recusal when I read their motion to reconsider. And they were worried about that, and you suggested that you ought to have more time simply because they wanted to look at the recusal. No, Your Honor. First of all, there had been a decision on the recusal, but as you know, you cannot appeal a recusal until after the entire case is over. So what happened was there was one order on the appeal and on two motions that were pending. You got to read what Judge Coyle said. I did. Okay. And what he did was he then says, National Union has filed a motion to alter or amend the judgment affirming the decision. And he further said National Union's motion for sanctions is directed to the Garber's motion for recusal in connection with their appeal from the bankruptcy court. So I could not have appealed that until everything was done. The recusal motion, as you know, must apply both to the appeal and to the motion for sanctions. I'm confused about something here. Okay. And it may be my confusion because there are two cases. But it looked to me like the gist of the appeal, the focus of the appeal, is the non-protonc order, and that was January 24. The appeal wasn't filed until March 21, which is way after the 30-day deadline. The excuse for it is that National Union had moved to correct the judgment in order to get the Rule 11 sanctions. But the order on that motion did not come down until within 30 days of the March 21 notice of appeal. My thought is the sanctions motion is collateral, just like attorneys' fees and costs. So it does not toll the time for appeal, just as attorneys' fees and costs motions do not toll the time for appeal. Usually they lead to filling in the blanks of a judgment or amending the judgment, and a second appeal that's consolidated with the first on the attorneys' fees and costs. Well, look at what I'm missing here. Well, look at what happened. There was an attempt by us to recuse Judge Boyle. That's a very important question. And it's an important question because Judge Boyle has been at the center of this entire case. But once the non-protonc order was done, wasn't the recusal order embraced within that non-protonc order so that you could appeal then? There was nothing left. I don't agree with that, Your Honor, because it's also the recusal order is also included within the sanctions order. We couldn't possibly have done anything with the recusal order. And, frankly, our problem was we were kind of caught on the horns of a dilemma. If we appealed the sanctions order, excuse me, if we appealed everything, we'd have to appeal, as you say, the recusal order, and then we'd be sitting there with Judge Boyle deciding whether we were going to get sanctioned. Well, we would anyway. We wouldn't get done with the appeal. Well, it put us in the difficult horns of a dilemma, Your Honor. I don't see the dilemma. You appeal it. You've got, as I understand it, the recusal order comes at time one, and the non-protonc order and final judgment for all purposes except sanctions and attorney's fees and costs comes at time two. Why is there only one order? It comes at time three. Why is there only one order? I don't understand. There was only one order, Your Honor, which dealt with both the sanctions and the appeal. Well. There was one order. A second order. And, Judge, I do. Did you ever ask for an extension of time from the judge? That's allowed under the rule. Well, I understand that. I replied, this is what, the court described the motion as one to alter or amend judgment by national union fire insurance and a motion to rule on sanctions. The court said it was a motion on the judgment. What am I supposed to do? Am I supposed to say the judge is wrong? He said it was a motion on the judgment, which is true. It was a motion on the judgment because there was only one order, and that encompassed everything. Why didn't you ask him for an extension of time? Well, I'm not sure that it would have been necessary once he had said that it was a motion on the entire judgment. Let's see. That's the caption of the case. That's the caption of the motion. It's a motion with respect to judgment. It says so in Judge Coyle's order, and he said so on the bench. I'm looking at what I think is the order that you're talking about, the order granting plaintiff's motion for sanctions against Betty Ting for spoliation. Is that the right one? I'm not sure which one you're referring to, Your Honor. Excerpts page 60. Is that the right thing for me to look at to understand your argument? Excerpts page 60? Yes. I'm sorry. I don't have that with me. What date is it, Your Honor? Appellant's excerpts. Your excerpt is volume 1 of 2, and it's an order that was filed June 7, 2000. Well, there was a first order, and the first order that was filed, which is the one that we appealed from, okay, or would have appealed from. There are so many orders, it's easy to get confused, and I may be confused, so I'm asking for your help here. You have to look at the various orders which were filed. The first order which was filed was one which dealt with two sanctions, motions, as Judge Coyle said, plus the appeal. Then afterwards there was a request to amend the judgment. There was only one judgment. So we stopped at that point, and we waited to see what would happen. We then responded. We went before Judge Coyle. Judge Coyle said, I said, my understanding is that there was an order and that this is the request that it be revisited. If the court so pleases, the court will revisit it and enter a new order, and if not, it won't. And then the court said, I will revisit the matter, and he did. And then the next day he filed an order which basically said that National Union's Motion for Attorney's Speech, I'm sorry, he then filed an order modifying the January 24, 2006 judgment and denied the motion for sanctions. It was all under Rule 59, too, wasn't it? What? It was all under Rule 59. I'm not sure, Your Honor. Are you talking about the case on the merits? Basis for the revision of the judgment. He's talking about the motion for reconsideration. I'm only talking about the motion for reconsideration, Your Honor. No, he's asking you. Is his motion for reconsideration done under Rule 59? Well, I believe it is, okay, but I'm not sure. I don't want to make a mistake here and say that I, I hope so. If it was. Okay. I think, if I understand you right, you're saying you just couldn't, as a practical matter, appeal until the judge decided whether he should have been recused. And I'm looking for the order where he says recusal was not required. He did that before his January 20. He did that before his original order. There was a specific order which said that I won't be recused. That's what I thought. That's right. That's what I asked you before. I thought that was time one. Right. But we couldn't appeal that until we got to the point where the appeal, where something had happened with regard to both the appeal and the sanctions. But you didn't have to wait for the Rule 59 and the sanctions in order to appeal that. All you had to wait for was the judgment. That's what I don't get. Why would he have to wait for the Rule 11 determination on, it wasn't your motion under Rule 59, it was the other side's, right? It was. It was the other motion. The other. Adversary's Rule 59 motion because they wanted more money. Right. They wanted some punishment. But the minute. Now, wait a minute. Let me make sure I've got this right. So you lose on sanctions. Then, subsequently, you lose on the merits. And then you've got a judgment. And from your point of view, it's all over and you've lost. Then the other side says, Judge, you have to correct the judgment so that we get even more money against the Garbers and Ting. That's the Rule 59 motion. It's not your Rule 59 motion. You've already lost on both. You're mixing up the case. I'm mixing it up? Yeah. Okay, go ahead. No sanctions motion in this case. There was no sanctions motion in this matter. It was in the next case that has the sanctions motion. There were no sanctions motions. The Rule 59 motion, was that yours or theirs in this case? When I say this, I think we're talking. Let's see. We're talking about 15570. Right. Okay. This is 15570. Right. The only question, Your Honor, for the court on this particular point is whether we were required to go ahead and appeal. I'm not sure what we would have appealed. The judgment? We couldn't appeal the recusal motion, and the problem is, had he found sanctions. Why not? You'd already lost, and you weren't moving for a Rule 59 amendment. The recusal motion goes to the sanctions as well. I mean, had he. . . Yeah, but your recusal motion didn't just go to the sanctions. It went to the whole case. It went to everything. So why would you have to wait for the sanctions motion to be decided? If the judge. . . suppose I own stock in General Motors, and I sit on a General Motors case. Yeah. I shouldn't have sat on a General Motors case. True. I just forgot I owned the stock in it. That can happen. Right. General Motors wins the case. I sign a judgment, back when I'm a district judge, in favor of General Motors. It seems to me you can appeal right then. And then when the other side files a Rule 59 and says, Judge, you should have given us something else too, it doesn't matter what. That would have been true had that been the way it occurred. That doesn't delay your appeal. In some circumstances, it could delay their right to appeal. Well. It could toll their appeal deadline. But for you, you lost on the sanctions, you lost on the case, and you're not asking for any change in the judgment. Your Honor, had the case occurred the way you described it, you would have been perfectly right. The problem is the sanctions motion was made before the judgment was even decided. And the judgment of Judge Coyle encompassed not only the sanctions motion, but what he considered to be our motion for sanctions, which never existed, actually. I don't think he even spoke to the recusal motion, did he, on the sanctions motion? No, because he had already decided it. Exactly. So the sanctions motion, recusal was ancient history by then. He didn't even talk about it in the order about the sanctions motion. And it wasn't your Rule 59 motion. Have I got that right? Your Honor, we could not have appealed. Once they asked for more time with regard to the sanctions, we could not have appealed the recusal. Does it make a difference as to whose Rule 59 motion it is? No, as far as I know. The minute it's filed, it's— But it seems to me to be right. If anyone makes a Rule 59 motion, judgment isn't final until it's decided. I hope so, because under these circumstances, it puts us in a terrible position, because we would have had to, according to what I'm hearing here, we would have had to have appealed the recusal motion while the judge was sitting there deciding whether we were going to get sanctions for arguing that he should be recused. What's terrible about that? Well, it's a horrible situation for us. Why? Because, frankly, as you noted, we did not even appeal the recusal motion because we didn't get sanctioned. We felt that it was—at that point, it became unnecessary. It was unnecessary, Your Honor, because it would have made this a terribly complex case to have argued all these various points. But— And we decided that—what was the point? Because if you agreed with us that he should have recused himself, it would have had to have gone all the way back to the district court and started all over again, a terrible cost to us. But, counsel, I think you've misinterpreted the questions because we have a case, a dead-on 1988 case, Munden v. Ultra Alaska, that says the court looks to the substance of the relief to determine whether the motion tolls the deadline. If the motion does not enable the judge to reconsider the validity of the judgment or to vacate it at all as he sees fit, it does not toll the time. Now, we have your appealing a non-protonct order on administrative fees. And you—the only motion to reconsideration filed here, as I tried to present it previously, had nothing to do with that. It had all to do with whether you should get sanctions because the judge did not believe your motion for recusal was appropriate. Rule 11 sanctions came out of that motion, having nothing to do with non-protonct administrative fees at all. And what you're now arguing is because it has somewhat— I guess something to do with something to do with the judge doing it, that now it automatically tolls. All we're trying to do is have you, if you can, explain to us how this substance of what they were asking for has anything to do with what you're appealing, which is the non-protonct. Let me ask you this, Your Honor. You were a district judge. Judge Kleinfeld was a district judge. I don't know whether Judge Hug was a district judge, but certainly two of you were. Under the situation which sat before Judge Coyle at that point, with a motion to amend the judgment, he could have done just about anything he wanted, as you know. He could have reconsidered. He could have decided that he should recuse himself. He could have gone to the entire appeal and decided, whoops, I made a mistake. There's no problem. As you know, he could have done it. Nobody would have criticized him had he wanted to do that. So since the motion was with respect to the entire judgment, at that point it is not a separate little motion with regard to sanctions. That's unlike the situation in which you were in the cases. The other cases are very clear because the sanctions motions are all made after the fact. Well, and this is why I ask you, why didn't you ever ask for an extension of time? It seems to me that it had come upon this situation, knowing full well, that the time for the non-protonct had far well gone, and now we have a motion for reconsideration about something where he might have, in the extreme, reading his opinion, I don't think he'd ever got there, said, I don't think I can do this, so now I'm going to get out of it and I'm going to give back all these Rule 11 sanctions. Why didn't you at that point say, oh, Judge, I thought about this, I got a little problem. Because we had that motion and because I thought it might be that, it seems to me you ought to give me more time to file my appeal. After all, it's now March 21, and I should have done this a long time ago, so maybe I ought to have a little time. And the rule allows for it. That's what worried me. And that's why I ask you, why didn't you do that? Rather than just come up and say to me, undo what the judge did. I looked at what the motion was, that's all I can tell you, and since it was a motion with respect to the judgment, which was everything, I didn't see that there was an issue. It was raised after the fact. Thank you, Counsel. Am I over time at this point? I didn't get a chance to say anything about the rest. Sorry. Thank you, Counsel. We didn't get to the merits. But we've got a lot of briefs. Yeah. Good morning, Your Honors. My name is Scott Reddy. I'm appearing on behalf of National Union Fire Insurance Company. This timeline is pretty confusing, and the subjects of the appeals in the different cases are easy to mix up. So maybe you could just state in clear summary form what the timeline and the subjects for appeal are in this case, 15570. I will, Your Honor. What happened was there was the initial non-protent order that came out of the bankruptcy court, which was appealed to the district court. After that appeal was filed, the Garbers filed a motion to recuse Judge Coyle from hearing that appeal. National Union thought it was a meritless motion to recuse and so notified the Garbers that they intended to file a motion for Rule 11 sanctions if they didn't withdraw their motion to recuse. Let's see. Number one, bankruptcy court decides non-protent in its appeal. Number two, Garbers moved to recuse the district judge from hearing the appeal. Right. Well, number two is Garbers appealed that to the district court. Yes. And then number three, Garbers filed a motion to recuse Judge Coyle from hearing that appeal. Number three?  So that would be number three. They filed a motion to recuse. Okay. Number four, National Union files a motion for Rule 11 sanctions ultimately with respect to only the motion to recuse, arguing that the motion to recuse was meritless and there was no basis for it. Then what happens is the appeal on the merits of the non-protent order goes forward as well as the motion to recuse. I back up. Court then rules on the motion to recuse, the district court, and denies it. Let's see. The district court denied the motion to recuse. Correct. And did it then also deny the or affirm the non-protent order? No, that happened after that. Okay. So then the court hears the appeal on the merits and affirms the non-protent order. At the same time as the hearing on the merits of the appeal, the court also heard the Rule 11 motion for sanctions. Those were heard at the same time. So the motion for Rule 11 sanctions with respect to the motion to recuse was heard at the same time as the merits on the appeal. But as I remember, the order affirming the non-protent order didn't speak to it. Correct. So what happened is we got the order. The order affirmed the non-protent order and said in the order that I think there was a footnote that National Union had withdrawn or said that it didn't file the motion for Rule 11 sanctions. It was some mix-up somewhere in the court. Next step is National Union files the motion asking the court to rule on the Rule 11 sanctions motion only. And that was the Rule 59 motion? Yes. It had nothing to do with the merits of the appeal. It had nothing to do with the motion to recuse. You filed a Rule 59 on the Rule 11. Right. And the idea had nothing to do with the recusal. What it had to do with is the court was just ---- It hadn't ruled on the Rule 11 sanctions. It had not ruled yet on the Rule 11. Right. Which Rule 11 sanctions grew out of the motion to recuse? Correct. It had nothing to do with the merits of the appeal, only the motion to recuse. And your argument was not that the judge had been wrong on recusal or right on recusal. No. It was just that the judge had overlooked a pending motion. Correct. All it did was say, Your Honor, you haven't ruled on the Rule 11 sanction motion. We need a ruling one way or the other. But it was a motion to alter or amend the judgment affirming the decision of the bankruptcy court. That's what it was called, I believe, because that's the only mechanism to get the issue in front of the court. Rule 59 was the only procedure that we had available to us. Yes, but if it's a motion to amend the judgment affirming the decision of the bankruptcy court, it seems like that brings the whole judgment under Rule 59. Well, and that's what the Munden court dealt with, which Justice Smith mentioned earlier, is what you have to do is you have to look at what's the motion actually looking for here and asking for? Because Mr. Hertz stated up here that he read through the motion. And if you read through the motion, you'll see that all it's asking the court to do is rule on the Rule 11 sanction request. The trouble I have with that is when the judge himself treats it as a motion to alter or amend the entire judgment, that misleads the appellant into delaying until such time as the entire motion is decided. Well, that's something that happened after the fact. If the appellant had read the moving papers, the moving papers make it clear that it has nothing to do with any of the other motions. If you're talking about the appellant getting the order from the court, at that point it's already too late. The time to appeal is run. So there's no misleading here. The appellant had to just read through the motion itself and see that all that was being asked for was a ruling on the motion for Rule 11 sanctions. Was it too late before the motion was made? No, because the motion — So if it wasn't too late, why wasn't the appellant misled by the fact that it looks like it's going to — this is a motion to amend the judgment, and the district court took it that way, that it was to amend the entire judgment under Rule 59? Well, but that's not what the moving papers asked for, and that's not what the district court judge did. Well, yeah, it is. It says, ruling on the motion to alter or amend the judgment affirming the decision of the bankruptcy court. That's the merits. Well, if that's what the court said, the court did say some things in that order. But, again, if you look at the substance of the order and what the court actually did, the court was simply making a ruling on the motion for Rule 11 sanctions. That's all that was ever asked for. There was never a motion. And if you read the opposition papers, there's nothing in there about going to the merits of any of the orders. This was a very simple matter, simply asking the court, you haven't ruled on this Rule 11 motion. We need a ruling. That's all. I'm kind of curious about something. You represent an institutional litigant that can be expected to be in court again and again. I'm kind of curious as to whether, if you think you're solid on the merits, that there were extraordinary circumstances here, the fraud and the spoliation of evidence, that justified the nunk pro tunk order, whether you'd be just as happy if you didn't get the appeal dismissed because it was late and instead you just got an affirmance. Sure. From a National Union standpoint, it doesn't really matter whether the ‑‑ I mean, obviously, it believes that the appeal should be dismissed, but it also believes that it has the strong arguments on the merits of the case. And I think in your Honor's statement there, there may have been a little confusion again between the two appeals because the nunk pro tunk order dealt with whether National Union needed to get prior court approval to proceed with the fraudulent transfer actions. If I understood that right, and it was kind of hard for me to understand because, frankly, the file is too voluminous for me to have mastered the excerpts of record. I understand. What happened was instead of the trustee suing the Garbers to get the money back from this property that Mrs. Garber had transferred to her sister just before they filed, the trustee got in bed with the Garbers and sued National Union. That's exactly what happened. Well, there was already a pending suit by the Garbers for $20 something million against National Union. The trustee decided to take on that suit against National Union. When National Union was trying to convince her that that suit had no merit, and actually the real case here is the case against the Garbers. What was that suit all about? The underlying suit. The $20 million suit against them. Those were cross-claims that the Garbers brought against National Union. For what? For fraud related to actions that happened back in the 1980s regarding the underlying bonds that were issued that started this whole 20 years of the case. I'm not hearing you. You're kind of garbling your words. Sorry, Your Honor. That arose back in the 1980s which started this whole litigation when the Garbers defaulted on some bonds and National Union had to sue them for reimbursement. They alleged all kinds of cross-complaint for fraud and things of that nature. You've been trying to get your money for 20 years? Yes. National Union has. The Garbers have been, as you know, this is I think the eighth appeal in the case. Was there any determination by the court as to why the trustee got in bed with the Garbers instead of National Union? Well, all I can tell you is that this trustee was removed from all bankruptcy cases shortly after this happened in, I believe, 1997. So, no, we don't know the reasons. Was it an independent trustee or U.S. trustee or was it a friend of the Garbers that they got appointed as trustee? No, it was a panel Chapter 7 trustee from the Eastern District that, again, shortly after that was removed as a panel trustee, I'm assuming for not being a good trustee. So, again, we don't know the reasons. You don't know, do we, whether that was the reason that Briones was removed? I'm sure this case may have had something to do with the whole big picture, but I don't think, I'm not aware of whether it was this case that had. We don't have something we can look at in the excerpts that says why? No, no. The other thing is that I guess if they had prevailed on their cross-claim, it would have been to the benefit of the estate, would it not? Sure, it would have. But, again, it was our contention all along that there was no merit to it, and the court found it, and the court, in fact, found that the cross-claims were. . . It would have benefited the estate and the other one also, but you can say that it was completely irrational for the Briones to have chosen to do that. Well, we probably knew a little bit more about the case than she did, and it was our position that it was irrational and that there was never any merit to it. And, again, the court actually found that they were frivolous cross-claims in the end. And that wasn't the only time that the Briones, and that's what I called her, I don't know what her name is, Briones decided not to go with the National Union. Correct. I mean, the first time they said we're not going to go because we're going to go with the debtors, and we're going to do it for the cross-claim. Then when she loses, then she tries, as most trustees do, being a little greedy, to say, well, you better give us something in order for us to give you that responsibility or that ability, right? Correct. Yeah, she then came to us and said, okay, you can pursue it. However, we want you to give up your secured claim. Right. Which there was no basis or no reason for National Union to do that. It would have been to the benefit of the estate if you had. For National Union to give up its secured claim? Well, sure it would have. That's what I'm saying. You know, if a trustee is looking for the benefit of the estate in her own mind, it might have been the best choice to have made. But I have trouble in saying that she's completely out of the water on all fours. Well, but there was no legal basis for National Union to give up its secured claim and its lien. There was absolutely no legal basis. And, in fact, if there was, there would have been litigation about it, and maybe it would have been avoided. But there was never litigation about it. That litigation that didn't happen, actually, when I read these briefs, what struck me most was the brief that wasn't there. I thought, here we start with the Garbers owing National Union a moderate amount of money. And it grows and grows over 20 years as the litigation grows and grows, because all the attorneys' fees and sanctions and whatnot. And I would have thought that the people who would have a real interest in fighting National Union would be the other creditors. So I was looking for the brief from the other creditors saying National Union is wrong, and it isn't there. Are there creditors? No, other than relatives and credit card companies who have never been involved in the bankruptcy case. This is really a dispute between National Union and the Garbers. Didn't have credit card companies coming in for the max on their maxed out cards, a whole bunch of them? No. They've all filed proof of claims, and that's the extent of their involvement in the case. But they did have proof of claims. Yes, there are. There are creditors that could have benefited. Yes, but they've never taken positions adverse to National Union one way or the other. Would they have gotten paid out of the estate once you got the real estate that was fraudulently conveyed? There's still money in the estate. There's still $200,000-plus sitting in the estate. So they'll get all their money out of the sale of the $1.3 million property? Whatever money they get, that's where it will come from. Again, the administrative expense. What I'm trying to find out is are all the other creditors covered because of the $1.3 million from the sale of the real estate? No, they won't get 100 percent, but they're going to get something. And the reason that the court. . . But if this is an administrative expense, they won't, will they? Oh, yes, they will. The administrative expense doesn't eat up all of the money from the estate, and that's why the court limited the amount of the administrative claim expense, so that there would be still money left over for other creditors. Because National Union was asking for a couple hundred thousand dollars more than it got, and the court said, no, I'm only going to give you this much because there needs to be money for the other creditors as well. Thank you, counsel. I think not, but if there's something to interject in the next appeal. Oh, okay. I just wanted to point out a couple things. First of all, it's incorrect to say that there's going to be money for the creditors. If they get their $139,000, there will be money for the creditors. They'll get about 50 percent on the dollar, maybe. Okay? They will not get paid in full. If they don't get their $139,000, they will be paid, and they'll get interest on top of it. Okay? That's an important point. Number two, there's a case, which I wanted to cite to you, which was decided after all the briefs were filed, and I think you ought to look at it on the merits, and that's In re Beal, 358-BR-744. It's a Northern District of Illinois case, and I think it's one of the few cases. There are very few cases on 503-B3B, as you know, and there's none in this district, in this circuit, excuse me, on the merits. So I think that that's an important point. And finally, Your Honor, I do point you to the contradiction in the brief, which has been filed. I don't know whether you got to that point, but on page 25 of the National Union brief, they say it would have been a fruitless endeavor at that time for National Union to seek court approval from Judge Ford to pursue the fraudulent transfer action on behalf of the estate. I think that's very important, because their argument all along was they did ask Judge Ford. So they contradicted themselves in the same brief. They've said on the one hand that Judge Ford, it would have been fruitless to ask him for permission, and on the other hand that they did ask him for permission. But see, if the other creditors get 50 cents on the dollar if National Union wins, but they get all their money if National Union loses. Correct. Plus interest. Does that mean that if National Union loses, there's any money left for the Garbers? Yes. Yes, we have a pecuniary interest in this case. Just a minute. I guess the record is unclear what would be in the estate if the counterclaims had won. Which counterclaims, Your Honor? I'm talking about the counterclaims that were dismissed that Brioni's went through. There is nothing in the record that would even permit you to do that, and I don't even know what it would have been. All right. Because it was all . . . What we're really talking about is whether the creditors, who would have maybe got nothing if National Union hadn't gone after the money, against getting something because they went after the money, and now we have some to divide up among all the creditors, but we're giving them an administrative claim before we divide it up. That's what we're really talking about. Not really, Your Honor. Let me point out a couple things. National Union never filed a claim in this case. The claims which are in this case are the credit card companies plus the relatives. Had National Union not been permitted to go ahead with this, the trustee, of course, would have then settled the matter, I'm sure, with the Garbers. It would have had money. It would have gone to the credit card companies. That's not in the record. No, of course not. But there's all kinds of things that one can speculate about. I mean, the bottom line is what is in the record is if the Garbers had won on their cross-claim, we don't know if there would be anything in the estate. Right. Since we had what we had, and now we didn't have any property to go after, we had a zero estate against a $500,000 estate, which was got because they went after something. That's what's in the record. Well, Your Honor. Is there anything else in this record that says that's wrong? The amount of speculation that one can make about this case is phenomenal, given the 16-year history. Is that speculation? Why is that speculation? We know the $500,000 was because it proceeded. That's right, Your Honor. But the real question in this case, and I put the Beal case to you because I think it's an important one. In the Beal case, they got a lot of money because of the creditor. The creditor clearly, and the court said so. Let's talk about this case. If I understood the record right, the Garbers shoveled all their assets over to Betty Ting, Mrs. Garbers' sister, and there would have been nothing for any of the Garbers' creditors except that National Union doggedly spent two decades chasing down the assets that were shoveled over to Mrs. Garbers' sister. Do I have the facts wrong? If I do, it really matters. You don't have the facts wrong. First of all, they didn't shovel it over. They gave them the security interest, which is pretty different. That's for starters. That's a shovel in a bankruptcy because a secured creditor gets the money. The fact of the matter is, Your Honor, we don't even know whether there would have been assets available beyond the secured creditor. We know so little about these various things. Remember the debt was $900,000 and the one property that was sold was $1.3 million. So there would have been money left over. But that $1.3 million would never have gotten into the bankruptcy estate if National Union hadn't chased it down. But, Your Honor, it was not a transfer. The two bankruptcy trustees were fully within their rights to sell the property. It was in the estates. There were two bankruptcy estates. They could have sold them. But then they had to play the sister, her secured interest. They'd be selling it for her. She'd get all the money. No, she wouldn't. Her bankruptcy trustee would. Remember, she filed, too. And they filed a claim in that case, too. We're talking about this, the Garber's bankruptcy. This is the Garber's, not Betty Ting's case. And the way I see it, I can't see how without National Union having gone after it to set that aside, how there would have been anything in the Garber's bankruptcy estate. Your Honor, I've been dealing with bankruptcies for 30-odd years. I know that when you have this kind of a situation, the immediate thing that one does is even if the trustee is standing there, the trustee is going to say, oh, I may go this way, I may go that way, you better offer me something. And you know what? They do. And they offer them plenty. Wait a minute. What's that got to do with the question I'm asking? It's the threat, Your Honor. What? It's the threat. It's the threat that the trustee would join in with National Union and go after the Garber's. She had that possibility as well, which nobody is even talking about. And had she done that, which she could have done, what would have happened? How do you evaluate that, some possibility of a threat? That seems to me going about as far as speculation can imagine. We do know that that had been transferred to Betty King. Correct. A security interest was transferred. That's correct. All right. So there was nothing in the estate with that having been transferred, right? No. I don't agree with that. Why not? Because it's a security. All of the property remains in the estate because it's only subject to a security interest. The question is what's the value of the property, and the property expanded in value over so many years that it's very possible that by the time we got to the time of sale, they would have been able to pay Betty King and also pay other people. I see. You're saying that because of the housing bubble, even though they shoveled all the value of the house over to Betty King, the housing bubble raised it even more. Exactly. I mean, you're speculating. We're speculating about all kinds of things. Because it took so many years. Exactly. And you're suggesting that we're to buy, that it's better to have a property without or with a security interest given to somebody else for some, I say, fraudulent debt, than it is to have property without a security interest. I'm not saying that, Your Honor. Well, that's what it seems to me you're arguing. I'm not saying it. I'm saying that what you have is that you're asking, you ask a pointed question, whether there would be any money left over, and I say, I don't know. Okay. And I think honestly, I don't know. And nobody else knows either. Thank you, counsel. 06-15570 is submitted.
judges: Hug, Kleinfeld, Smith